IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIELLE MCKAY and BRIDGET A. HENSEL, | ) ) ) | |
| | ) | Civil Action No. 16-569 |
| Plaintiffs, | ) ) | |
| v. | ) ) | United States District Judge Nora Barry Fischer |
| ANTHONY MCKAY, OFFICER DAVID M. SISAK, OFFICER PETER BECHTOLD, OFFICER SCOTT BOBAK, OFFICER DAVID SPINNEWEBER, and THE CITY OF PITTSBURGH, | ) ) ) ) ) ) ) | United States Magistrate Judge Cynthia Reed Eddy |
| Defendants. | ) ) | |

## REPORT & RECOMMENDATION

**Cynthia Reed Eddy, United States Magistrate Judge.**

### I. RECOMMENDATION

For the reasons that follow, it is respectfully recommended that Plaintiffs' pending Motion for Default Judgment against Defendant Anthony McKay (ECF No. 24) be granted. After conducting a hearing to determine the amount of damages, the Court recommends that judgment be entered in favor of Plaintiff Danielle McKay in the amount of $15,000, and that judgment also be entered in favor of Plaintiff Bridget A. Hensel in the amount of $15,000.

### II. REPORT

#### A. Factual Background

This is a civil rights action initiated by Plaintiffs Danielle McKay and Bridget A. Hensel against the City of Pittsburgh, several police officers employed by the City, and Anthony McKay. Plaintiffs assert in their complaint that Defendants are liable under 42 U.S.C. § 1983 for deprivation of their federal rights, conspiracy to deprive them of same, false arrest, and malicious

1

prosecution. The allegations from the complaint are as follows.

During the relevant time period, Plaintiff McKay and Defendant McKay had been separated for several years. They have a minor son, who was in the custody of Plaintiff McKay, with only visitation rights for Defendant McKay. Defendant McKay is a bounty hunter, and although not a police officer himself, he was professionally associated with and personal friends of the individual police officer Defendants. On Sunday, June 9, 2013, Defendant McKay wished to see his son, who was playing with Plaintiff Hensel's son at her house. Defendant McKay separately harassed and threatened Plaintiffs via phone that if he could not see his son, he would have them both arrested for violating a custody order; however, no such custody order existed. All of the parties went to Plaintiff Hensel's residence, including the police officer Defendants, who were called by their friend Defendant McKay. Holding a paper which they claimed was a custody order, the police threatened to kick in Plaintiff Hensel's door if she did not turn over custody of the child to Defendant McKay. The police officers refused to allow Plaintiffs to view the fake custody order, and eventually arrested Plaintiffs without explanation. Plaintiffs were transported to Allegheny County Jail, where they were held for several hours and released in the early morning of the following day. Plaintiffs were criminally charged with interference with custody of children. Because there was no basis whatsoever for these charges, the charges were dismissed at the preliminary hearing.

### B. Procedural Background

This action was initially filed in the Court of Common Pleas of Allegheny County, and was removed to this Court on May 6, 2016 by all of the Defendants except for Defendant McKay. (ECF No. 1). While Defendant McKay did not join in the removal, the notice of removal indicates that he had notice of this action at the time of removal. It states that, "[o]n

May 2, 2016, Attorney Kennedy [then-counsel for the City] spoke with Defendant Anthony McKay" and that "Defendant McKay consents to the removal to Federal Court." (ECF No. 1 at ¶ 7).

On July 26, 2016, the Court entered an Order scheduling a Case Management Conference to occur on September 8, 2016. (ECF No. 8). The Court mailed a copy of this Order to the address listed for Defendant McKay. Defendant McKay did not attend the September 8, 2016 Case Management Conference. At this conference, defense counsel for the individual police officer Defendants and the City reiterated that they had communicated with Defendant McKay about this case and stated that he was aware of it.[1] That same day, the Court mailed copies of the minute entry from the conference and the Case Management Order to Defendant McKay.

Plaintiffs and all of the Defendants, except for Defendant McKay, proceeded to discovery. In December 2016, the Court was notified that these parties had settled the case, subject to and pending approval by City Council. (ECF No. 18 & Minute Entry from 12/14/16). The settlement is currently moving through the process of being approved by City Council.

On December 14, 2016, consistent with Federal Rule of Civil Procedure 55(a), Plaintiffs filed a Request to Enter Default against Defendant McKay for failure to plead or otherwise defend the allegations asserted by Plaintiffs in the complaint, (ECF No. 23), which was entered by the Clerk of Court the following day. (ECF No. 25). Plaintiffs also filed the pending Motion for Default Judgment on December 14, 2016 against Defendant McKay in accord with Rule 55(b). (ECF No. 24).

---

[1] Specifically, the minute entry from this conference states that, "[a]t this conference, the parties indicated that Mr. McKay had been properly served in this action when it was initiated in the Court of Common Pleas of Allegheny County, Pennsylvania, that Mr. McKay consented to have this action removed to this Court, and that Mr. McKay received notice of this conference when the Court mailed him a copy of the Order scheduling this conference and setting all applicable deadlines." (ECF No. 11 at 1) (internal citations to the docket omitted).

## C. Hearing on Motion for Default Judgment

On February 10, 2017, the Court held a hearing on Plaintiffs' Motion for Default Judgment. (ECF No. 32). Plaintiffs McKay and Hensel, together with their counsel, Attorney Goodrich, were present. Defendant McKay did not appear for this hearing.

The hearing began by Attorney Goodrich establishing that Defendant McKay had notice of the hearing. In accordance with the directives in the Court's order rescheduling the hearing to occur on February 10, 2017, (ECF No. 28), Plaintiffs filed a certificate of service on January 13, 2017 (ECF No. 31) affirming that Defendant McKay was served with said Order. Moreover, Attorney Goodrich indicated that Defendant McKay had notice of the lawsuit because Defendant McKay, through his family law attorney, attempted to use it as a "quid pro quo" in his ongoing divorce proceedings with Plaintiff McKay. Attorney Goodrich explained to Defendant McKay's family law attorney that the Plaintiffs in this action were seeking a default judgment against Defendant McKay. As a result, Plaintiffs have established that Defendant McKay had notice of the hearing, but chose not to attend.

Next, Attorney Goodrich called both Plaintiffs to testify. Each Plaintiff gave strong and credible testimony as to how Defendant McKay's conduct has affected them. Although this incident occurred more than three and a half years ago, they were visibly upset and cried during their testimony. It was clear to the Court that their testimony was sincere and that they are still deeply affected by Defendant McKay's unconscionable actions.

Plaintiffs' testimony included a recitation of the factual circumstances surrounding their arrests. Said recitation was consistent with, and expanded upon, the factual allegations set forth in their amended complaint. Their testimony, relevant to the issue of damages, was as follows.

In June 2013, Plaintiff McKay's father passed away, and his funeral was on Friday, June 7, and Saturday, June 8, 2013. Plaintiff McKay's father helped raise her son and was very close with him. Plaintiff McKay's son was extremely upset by his grandfather's death. By agreement between Plaintiff McKay and Defendant McKay, Defendant McKay was entitled to visit with their son every other Saturday, which happened to fall on the weekend of the funeral. On Friday, June 7, Plaintiff McKay spoke with Defendant McKay and, given the circumstances, Defendant McKay agreed to let their child be with Plaintiff McKay that weekend.

Plaintiff McKay and Plaintiff Hensel's children had been close friends for several years, frequently playing together and sleeping over at each other's houses. The children spent much time together that weekend. On Sunday, June 9, Plaintiff McKay took her son over to Plaintiff Hensel's house so that their children could play and because Plaintiff McKay had to help her mother with various issues related to the funeral and her father's death.

Although he had agreed to let his son be with Plaintiff McKay the whole weekend, Defendant McKay began making several threats to both Plaintiffs that if he could not see his son immediately, he would have them arrested for violating a custody order that did not exist. Defendant McKay knew that his son was at Plaintiff Hensel's house. Plaintiff Hensel asked the child if he wanted to see Defendant McKay, and the child stated that he did not, as he was playing video games at the time. Plaintiff Hensel conveyed this message to Defendant McKay, which caused him to become very angry. Because Plaintiff McKay brought the child over to Plaintiff Hensel's house, Plaintiff Hensel refused to release the child to Defendant McKay.

Defendant McKay followed through on his numerous threats by traveling to Plaintiff Hensel's house and arranging for his police officer friends to meet him there. The police arrived in three or four separate police cars. When Plaintiff McKay learned that the police were at

Plaintiff Hensel's house, she rushed over there. Shortly thereafter, the police became impatient that Plaintiffs would not turn over custody of the child to their friend, Defendant McKay. The police refused to show Plaintiffs the document in their possession which they claimed was a custody order that Plaintiffs were violating. This is because no such document existed. The police proceeded to arrest both Plaintiffs in front of their children and in front of Plaintiff Hensel's neighbors, and refused to explain the basis for the arrest. When Plaintiff McKay's son saw his mother placed in handcuffs he began to cry. Plaintiffs were placed in a police vehicle and were transported to Allegheny County Jail.

Upon their arrival at the jail, Plaintiffs were fingerprinted. Their mugshots were taken. Their bodies were searched. Plaintiff McKay stated that having her body searched at the jail was the worst feeling in the world. Plaintiff Hensel said that it made her feel dirty and that she could not believe what was happening. For these several hours, Plaintiffs sat in a jail cell in disbelief that Defendant McKay was able to have his police officer friends arrest them without cause. They experienced a number of emotions, including fear, humiliation, and disappointment. Plaintiffs testified that they felt let down and betrayed by the system. Plaintiff McKay did not know where her son was and she was concerned for his well-being. Though they did nothing wrong, Plaintiffs were also worried they would lose their jobs as a result of being arrested. They were released after 2:00 a.m. and were taken home by Plaintiff Hensel's husband.

The whole time that Plaintiffs sat in jail, Defendant McKay was with his son. When Plaintiff McKay reunited with the child, he was still very upset and crying; and she had to console him. The child was already upset that his grandfather had just passed away. His mother being thrown in jail for no justifiable reason the weekend of the funeral made him even more upset. Therefore, despite just going through one of the worst experiences of her life, Plaintiff

McKay was required to have a long and difficult talk with her son, trying to explain what had just happened. This, in turn, caused Plaintiff McKay to be even more upset. She was so upset that she could not go to work the next day and had to use a vacation day. She had to notify her boss that she was arrested; and she was told that it would be reported to company headquarters and they would "look into the situation." She had to use two more vacation days to attend the preliminary hearing. Each vacation day that she used caused her to incur costs of $157.68, for a total of $473.04. She also had to spend $700 on a lawyer for the preliminary hearing, and another $500 for expungement of her record. Thus, in addition to the distress she experienced, her out-of-pocket costs related to Defendant McKay's conduct totaled $1,673.04.

Plaintiff Hensel was also very upset from what happened to her; she testified that she would not wish it on her worst enemy. She was humiliated that she was arrested by several police officers in front of her neighbors. She went to work just a few hours after being released from jail because she was so worried that she would lose her job as a result of being arrested. She has not told anyone at work that she was arrested out of fear that she will lose her job and because of the potential effect that it could have on her reputation. She had to use four vacation days as a result of this incident, which totals $736. She also had to spend $900 to hire an attorney for the preliminary hearing. Thus, in addition to the distress she experienced, her out-of-pocket costs to date are $1,636. Further, she testified that she has not yet been able to afford to expunge her record but she plans to do so, which will cost her about $500.

Both Plaintiffs testified that they signed a 40% contingency fee agreement with their attorney. At the conclusion of the hearing, their attorney stated that under the circumstances, an award of $15,000 for each Plaintiff would be appropriate in this case.

### D. Discussion

Federal Rule of Civil Procedure 55(b)(2) provides for entry of default judgment in favor of the plaintiff where the defendant has failed to plead or otherwise defend. Fed R. Civ. P. 55(b)(2). Although the Court's decision as to whether to grant a default judgment is discretionary, *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000), the Court of Appeals has "repeatedly stated [its] preference that cases be disposed of on the merits wherever practicable." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) (collecting cases). In deciding whether to enter a default judgment, the Court of Appeals has instructed that the District Court should consider (1) the prejudice to the plaintiffs if the default is denied, (2) whether the defendant appears to have a defense to the action, and (3) whether defendant's delay is due to culpable conduct. *Chamberlain*, 210 F.3d at 164; *see also Catanzaro v. Fischer*, 570 Fed. App'x 162, 165 (3d Cir. 2014). The Court finds that Plaintiffs have satisfied these factors.

Regarding the first factor, the Court notes that Defendant McKay is the only defendant left in this action. Plaintiffs have reached a settlement with all of the other Defendants, which is currently moving through the process of being approved by City Council. Defendant McKay has made no effort to defend this case and he is the only Defendant preventing Plaintiffs from attaining the finality regarding this incident that they most definitely deserve. Given that he has completely disregarded this lawsuit, a default judgment is the only option that Plaintiffs can pursue against Defendant McKay. Accordingly, Plaintiffs would suffer prejudice if their motion was denied.

With respect to the second factor, it does not appear, based on the allegations in the complaint and Plaintiffs' testimony, that Defendant McKay has a defense to this action. To the extent that he would attempt to argue that he cannot be held liable under § 1983 because he is a

private individual, such a defense would be unavailing. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151 (1970) (a private party can be held liable under § 1983 for conspiracy to deprive an individual of his or her constitutional rights if the private party "jointly engaged with state officials in the prohibited action"); *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) ("[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents."); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982) (a person who has acted together with or has obtained significant aid from state officials may fairly be said to be a state actor); *Abbot v. Latshaw*, 164 F.3d 141, 148 (3d Cir. 1998) (ex-wife who allegedly conspired with a state constable and police officers to repossess her ex-husband's vehicle without due process was a state actor because the complaint depicted "joint action … in effectuating the recovery of the van"). Therefore, the Court concludes that this factor also supports granting Plaintiffs' motion.

The third and final factor – whether the delay was due to Defendant McKay's culpable conduct – weighs most heavily in favor of granting the Plaintiffs' motion for default judgment. Defendant McKay has known about this action since at least May 2, 2016, the date that he gave consent to the attorney from the City to have the action be removed to this Court. Since the case was removed to this Court, he has failed to respond to the allegations in the complaint. He has likewise ignored the Court's orders scheduling conferences and hearings throughout this lawsuit, notwithstanding his communications with the other Defendants' attorneys and being served with the notices at his address. Further, it is particularly troubling that despite ignoring this lawsuit, Defendant McKay has nevertheless attempted to use it as a "quid pro quo" in his ongoing divorce proceedings with Plaintiff McKay. As he has been aware of this lawsuit from the beginning, Defendant McKay's delay in failing to respond to the complaint is absolutely due to

9

culpable conduct. Indeed, while we always prefer resolving cases on the merits, Defendant McKay's willful disregard of this lawsuit has made it impracticable to do so here. *See Hritz*, 732 F.2d at 1181.

Having concluded that all three factors are present, the Court will now consider the amount of damages that should be awarded to Plaintiffs. In a § 1983 action, the plaintiff may recover compensatory and punitive damages against an individual defendant. "[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation …, personal humiliation, and mental anguish and suffering.'" *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). To recover compensatory damages based on mental distress, there must be an actual injury supported by competent evidence. *Chainey v. Street*, 523 F.3d 200, 216 (3d Cir. 2008). Nevertheless, there is no "require[ment] that a specific type of evidence be introduced to demonstrate injury in the form of emotional distress." *Bolden v. SEPTA*, 21 F.3d 29, 36 (3d Cir. 1994). Distress (meaning mental suffering or emotional anguish) "is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Carey v. Piphus*, 535 U.S. 247, 263-64 & n. 20 (1978). "Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others." *Id.* at n. 20. Punitive damages, in contrast, are designed "to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura*, 477 U.S. at 306 n. 9. In a § 1983 action, an award of punitive damages is discretionary and only recoverable "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages

may be awarded to the plaintiff solely on the basis of a constitutional violation even if the plaintiff has not suffered any emotional or mental distress from that violation. *Allah v. Al-Hafeez*, 226 F.3d 247, 252 (3d Cir. 2000).

At the conclusion of the hearing, Plaintiffs' counsel requested that each Plaintiff be awarded $15,000. Based on Plaintiffs' testimony at the hearing, the Court finds that this requested amount is reasonable, appropriate, and proportionate to Defendant McKay's conduct. As Plaintiffs were describing the nature and circumstances of the events in which they were wrongly arrested, it was obvious to the Court that they are still deeply distressed by Defendant McKay's actions. It is unimaginable that Defendant McKay was able to use his friendship with certain police officers to have the mother of his son and the woman who was watching his son arrested for interfering with a fake court order. This was a conscious choice that he made. Indeed, prior to making this choice, he made several threats that he would have Plaintiffs arrested. Being arrested by several police officers in front of their families and neighbors was both scary and humiliating to Plaintiffs. Once they arrived at jail, they were fingerprinted, their mugshots were taken, and their bodies were searched, which they testified made them feel dirty and described as the worst feeling in the world. They each had to miss several days of work and spend money to hire lawyers to have the false charges dropped. Even though their names have been cleared of wrongdoing, Plaintiffs will always have to face the fact that they were arrested, and they fear that their mugshots are a permanent reminder of this fact.

It was self-evident from Plaintiffs' powerful testimony that Defendant McKay caused them to be scared, upset, humiliated, disappointed, and hurt; and that they continue to experience these emotions today, more than three and a half years later. Simply put, Defendant McKay's conduct was horrendous. Plaintiffs convincingly established at the hearing that the mental and

emotional anguish that they have had to endure since this incident is easily worth the value that they have requested. Moreover, the requested amount is reasonable in light of the fact that Defendant McKay's actions were so callous and indifferent to Plaintiffs' constitutional rights that punitive damages would be justified under the circumstances. Accordingly, the Court should enter judgment against Defendant McKay and in favor of each Plaintiff in the amount of $15,000.

### III. CONCLUSION

Based on the foregoing, it is respectfully recommended that Plaintiffs' Motion for Default Judgment (ECF No. 24) be granted. Judgment should be entered in favor of Plaintiff Danielle McKay in the amount of $15,000, and also be entered in favor of Plaintiff Bridget A. Hensel in the amount of $15,000. Any party is permitted to file Objections to this Report and Recommendation to the assigned United States District Judge. In accordance with 28 U.S.C. § 636(b), Fed.R.Civ.P. 72(b)(2), and LCvR 72.D.2, Plainitffs' Objections are due by **March 7, 2017**. Because service of this Report and Recommendation is being made on Defendant McKay via mail, his Objections are due by **March 10, 2017**. *See* Fed.R.Civ.P. 6(d). The parties are cautioned that failure to file Objections within this timeframe "*will* waive the right to appeal." *Brightwell v. Lehman*, 637 F.3d 187, 193 n. 7 (3d Cir. 2011) (emphasis in original).

Dated: February 21, 2017.

By the Court:

s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc: Anthony McKay
1221 Oakleaf Drive
Pittsburgh, PA 15207

All registered users of CM-ECF.